Filed 3/26/21  P. v. Torres CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMIE REYES TORRES,<br><br>    Defendant and Appellant.<br><br>In re JAMIE REYES TORRES<br><br>    on Habeas Corpus. | G058849, G059325<br><br>(Super. Ct. No. 08HF1601)<br><br>ORDER MODIFYING OPINION, AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

        This court hereby orders that the opinion filed herein on March 19, 2021, be modified as follows:

        1.  The above caption has been modified to include the habeas corpus caption.

        2.  On page 1, first paragraph, after second complete sentence, add the following sentence:  "Petition denied."  After modification the last two sentences read, "Affirmed in part and reversed in part.  Petition denied."

        3.  On page 2, fourth complete paragraph, at the end of third complete sentence, add the following to the end of the sentence:  "and the petition of habeas corpus

is denied."  After modification the sentence reads, "In all other respects, the judgment is affirmed and the petition of habeas corpus is denied."

4.  On page 14, second complete paragraph, add the following footnote 3 at the end of the paragraph ending with "trial counsel":

Torres makes two additional claims of ineffective assistance of counsel, and a claim of "false testimony" by a witness in his consolidated petition for a writ of habeas corpus (G059325).  We are rejecting these habeas claims for the same reason as we are affirming the trial court's ruling on the motion for new trial (lack of prejudice).

5.  On page 17, within disposition, add the following to the end of the second sentence:  "and the petition for writ of habeas corpus is denied."  After modification the sentence reads, "In all other respects, the judgment is affirmed and the petition for writ of habeas corpus is denied."

The petition for rehearing is DENIED.  This modification does not change the judgment.

MOORE, ACTING P. J.

WE CONCUR:

ARONSON, J.

THOMPSON, J.

2

Filed 3/19/21  P. v. Torres CA4/3 (unmodified opinion)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058849, G059325 |
| v. | (Super. Ct. No. 08HF1601) |
| JAMIE REYES TORRES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed in part and reversed in part.

James M. Crawford for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Generally, a defendant's prior crime may not be admitted for the purpose of proving a defendant's character: a disposition or propensity to commit a new charged crime. However, a defendant's distinctive method of committing a prior crime may be admitted for the purpose of proving identity: the defendant was the person who committed the new charged crime. (Evid. Code, § 1101, subd. (b).)[1]

Here, a man with white material wrapped around his head committed an armed bank robbery. Just after the robbery, the robber's baseball hat was found outside of the bank. The police later arrested defendant Jamie Reyes Torres, who told the police he had a prior conviction in which he was dubbed the "Mummy Bandit." Torres' DNA sample was a match with DNA recovered from the baseball hat.

The jury convicted Torres of five counts of armed robbery. Torres filed a motion for new trial arguing ineffective assistance of counsel. The trial court denied the motion and imposed a 19-year sentence, including one year for a state prison prior.

Torres claims the court erred by: A) admitting his statement to the police; B) denying his new trial motion; C) quashing a subpoena for his trial counsel's medical records; and D) imposing the sentence for the prison prior. We reverse the prison prior and remand for resentencing. In all other respects, the judgment is affirmed.

I

FACTS AND PROCEDURAL BACKGROUND

On Saturday, May 24, 2008, at about 2:30 p.m., a man entered a Wells Fargo Bank in Newport Beach with a handgun. There were four tellers on duty; there was only one customer present in the manager's office. The robber approached each teller's window demanding money. The robber specified he did not want $1 bills or bait money. Each of the tellers complied. The robber left the bank with over $50,000. The

---

[1] Further undesignated statutory references are to the Evidence Code; further references to section 1101, subdivision (b), are abbreviated to section 1101 (b).

2

entire armed robbery took less than two minutes.

The robber had white "gauzy" material wrapped around his face, ears, neck, and tied in the back of his head. The robber was wearing a black baseball hat with distinctive embroidered blue lettering. The robber was wearing gloves, a long coat, and blue jeans. One witness described the robber as having "very tan skin." Another witness described the robber's skin tone as not black, "but it wasn't white." Two witnesses said the robber may be Asian. An additional witness "got the impression that the [robber] was African-American."

Right after the robbery, one of the tellers looked out a window at the bank's parking lot. She saw two vehicles leaving the parking lot (a silver car and a black SUV), but she could not see into the vehicles and did not see the robber. The sole bank customer went outside and saw the distinctive baseball hat the robber had been wearing. The hat was lying in the middle of the road, near a grocery store within the same shopping center as the Wells Fargo bank. The hat was located about 300 feet from the front doors of the bank. The customer had been directed to the baseball hat by an unknown man.

*The Investigation and Arrest*

The police obtained still photographs from the bank's video of the robbery. The police recovered DNA from the inner sweatband of the robber's baseball hat, which was later identified as a potential match with Torres.

In September 2008, the police issued a wanted person bulletin identifying Torres as a suspect, which included still photographs from the bank and a photograph of Torres. The police included a description of Torres and the vehicle he may be driving (a black Chevy Blazer). The police did not disclose to the public how Torres had been identified as a suspect.

3

The police were attempting to apprehend Torres by conducting surveillance on his girlfriend. The police learned Torres's girlfriend had rented a PT Cruiser from a car rental agency and left a black Chevy Blazer in the parking lot. The following day, the police conducted a traffic stop of the PT Cruiser. The police found Torres lying in the backseat within arm's reach of a fixed blade knife.

Police arrested Torres and took him to the Newport Beach Police station, where they took a buccal (DNA) swab from his cheek. After a detective advised him of his rights, Torres denied responsibility for the bank robbery on May 24, 2008. The detective showed Torres a still image from the robbery and pointed out the baseball hat the robber was wearing. The detective told Torres, "'Your DNA was found on that hat.'" Torres said the hat belonged to him, but he lost it on Cinco de Mayo, while working on a car detailing crew in Newport Beach.

Torres said that his brother had told him four of five days earlier that he was wanted by the police for the armed robbery. The detective asked him, "'Well, why didn't you turn yourself in?'" Torres said, "'I was scared, my DNA was on the hat.'" Torres also said "he needed some time to gather some money to hire an attorney previous to turning himself in." Torres was asked about a prior conviction and Torres said "'they dubbed me the Mummy Bandit.'"

*Court Proceedings*

In December 2009, the prosecution filed an amended information charging Torres with five counts of robbery while armed, and one count of being a felon in possession of a firearm. The information further alleged Torres had two prior federal bank robbery convictions, six prior strike convictions, two prior serious felony convictions, and a state prison prior.

In January 2010, a jury trial began. The prosecution introduced the testimony of 13 witnesses, including a forensic DNA expert. The expert witness

4

reviewed the DNA recovered from the robber's baseball hat and opined there was both a major and a minor contributor. The witness said that the DNA obtained from Torres was a match with the major contributor. The prosecution introduced several exhibits, including a reproduction of Torres' driver's license near the time of the robbery, showing his skin complexion, approximate height, weight, etc.

Torres called two witnesses. A forensic DNA expert opined the Orange County Crime Lab did not handle the DNA testing according to accepted standards and protocols (which was challenged on rebuttal by the prosecution's expert). Torres' brother testified he owned a mobile car detailing business in which Torres was employed. Torres' brother said the employees all wore baseball caps that were frequently exchanged for new ones. He testified that he paid his employees in cash and did not keep records. On cross-examination he said (for the first time) he remembered Torres was working for him on May 24, 2008.

In February 2010, the jury found Torres guilty of all the charges and found true all the enhancements. The following month, the court granted Torres' motion to relieve his appointed trial counsel. Four months later, trial counsel died from advanced brain cancer.

In February 2015, Torres filed a motion for new trial on grounds of ineffective assistance of trial counsel. The court denied the motion.

In May 2019, the trial court received trial counsel's medical records, which Torres had obtained through a subpoena duces tecum. Trial counsel's estate filed a motion to quash the subpoena. The court granted the motion.

In January 2020, the trial court sentenced defendant to a prison sentence of 19 years, including one year for the state prison prior.

II

DICUSSION

Torres contends the trial court erred by:  A) admitting his statement to the police about being the "Mummy Bandit"; B) denying his motion for new trial on grounds of ineffective assistance of counsel; C) granting the third party's motion to quash the subpoena; and D) imposing a one-year sentence for the state prison prior.


*A.  The Admission of Torres' Statement About Being Dubbed the "Mummy Bandit"*

A court's ruling on the admissibility of evidence is reviewed for an abuse of discretion.  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.)  "Specifically, we will not disturb a trial court's admissibility ruling "'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"" (*People v. Morales* (2020) 10 Cal.5th 76, 97.)

In this part of the discussion we will:  1) review general principles of law regarding section 1101 (b) evidence; 2) consider the relevant facts from the record below; and 3) analyze and apply the law to the relevant facts.


*1.  General Principles of Law*

Evidence of uncharged misconduct is inadmissible at a criminal trial if its purpose is to show the defendant had a disposition or propensity to commit the charged offense.  (§ 1101, subd. (a).)  However, "this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition," such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393; § 1101 (b).)

"Evidence of uncharged crimes [under section 1101 (b)] is admissible to prove identity, common design or plan, or intent only if the charged and uncharged

6

crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.) "A greater degree of similarity is required in order to prove the existence of a common design or plan." (*Ibid.*) "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity." (*Id.* at p. 403.)

If a trial court finds that uncharged misconduct evidence is relevant to prove a material fact other than the defendant's criminal disposition, the court must then consider whether the potential for prejudice outweighs the probative value of the evidence. (§ 352; *People v. Lewis* (2001) 25 Cal.4th 610, 637.) "'The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*Ibid.*)

### 2. *Relevant Proceedings*

Prior to trial, the prosecution sought to admit Torres's statements to the police following his arrest. The prosecution submitted a transcript of the interview, and a still photograph of the bank robber (shown below).



During a pretrial hearing, the court identified Torres' statements that were at issue: "number one, that he denied committing the robbery; number two, that he admitted he owned the hat found near the robbery scene; number three, Mr. Torres said he lost the hat in the area of the robbery before the crime was committed; number four, Mr. Torres told the police that the person who gave him the hat is now dead; number five, Mr. Torres said he spent ten years in federal prison for committing 54 robberies; and number six, then, it was for that he was dubbed the Mummy Bandit."

The prosecution said it was not "seeking to introduce the fact that he's spent ten years in federal prison. I don't think that's relevant." Torres objected to the admission of his statements "telling the police that he committed 54 robberies and [he] was dubbed the mummy bandit." After reviewing general principles of law, the court stated its ruling as follows:

"In this particular case, the People's offer of proof is that the robber wrapped his head in some white type of cloth which gave the robber's head an unusual covering like that of a mummy. It would appear to this court that this is an unusual and distinctive manner of disguise, and far more time consuming to put together than simply donning a mask or some other form of head cover.

"Further, in this case the defendant volunteered to the police that he spent significant time in prison for multiple bank robberies, not just generic robberies, but bank robberies.

"It also appears from his statement that the modus operandi of those robberies involved some unique characteristics giving him the nickname the Mummy Bandit, although from Mr. Torres's statement, he is not saying he called himself the Mummy Bandit. Rather, he was dubbed the Mummy Bandit.

"His volunteering that nickname to the police indicates to the court from its context that he adopted the sobriquet. The unique characteristics of the People's offer of proof regarding the instant offense would be these factors: that the robber wrapped his

8

head in some sort of white cloth, the robberies involved the specific site as to the crime, that is a bank . . . , and that Mr. Torres told the police he served federal prison time for 54 bank robberies as opposed to robberies involving other locations, and that his actions in those robberies earned him the nickname the Mummy Bandit.

"When reviewing all of this evidence together, this appears to be within the spirit of 1101(b)'s exception . . . regarding identity evidence."

The trial court continued:

"The next issue is whether its probative value is substantially outweighed by its prejudicial value under Evidence Code section 352. The court does find that its probative value outweighs its prejudicial value. Still an instruction to the jury to consider it for purposes of identity only and not for propensity evidence will help to lessen any prejudicial impact. The court will order the People to include such an instruction in its submitted packet of instructions to be submitted to the court before the People rest.

"Further, the court also feels its prejudicial impact can be lessened by sanitizing the statement. Preliminarily, my thoughts were that we need to excise from the statement that Mr. Torres said he went to federal prison for ten years for 54 bank robberies. That would lessen its prejudicial impact.

"The People now have offered to stipulate away a portion of that statement dealing with federal prison for ten years. That would leave us with Mr. Torres's statement that he apparently, I guess, did time for 54 bank robberies. I think it needs to be sanitized further than that." Following a recess, the parties agreed the detective would limit his testimony to the following: Torres said that he was convicted of a previous crime for which "he was dubbed the Mummy Bandit."

On direct examination, the detective testified Torres "volunteered that he had a previous conviction and for that conviction he was dubbed the Mummy Bandit." On cross-examination, the detective testified: "I asked him if he was given a name and he said, 'Yes, you guys are going to put this in the f*cking paper. I was called the

9

Mummy Bandit.'" The court gave a limiting instruction to the jury before its deliberations. (CALJIC No. 2.50 ["this evidence, if believed may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes"].)

### 3. Analysis and Application

The prosecution sought to admit Torres' statement about previously being dubbed the "Mummy Bandit" for the purpose of proving Torres was the person who committed the instant bank robbery. (§ 1101 (b).) The court reviewed the photograph of the white cloth covering the robber's head, which the court found to be "an unusual and distinctive manner of disguise" as opposed to "some other form of head cover." The court also reviewed the transcript of Torres' interview at that time of his arrest. Torres said that he spent 10 years in prison for committing 54 prior bank robberies, as opposed to some other form of robberies, which the court also found to be distinctive.

The trial court's ruling under section 1101 (b) is supported by the evidence in the record (the photograph and interview transcript). Further, the court took additional steps to limit the prejudicial impact of Torres' statement about being dubbed the "Mummy Bandit" by not allowing testimony about Torres' extensive criminal record, and by giving a limiting instruction to the jury. (See § 352.) We cannot say that the court's ruling was arbitrary or capricious; rather, the court appears to have thoughtfully weighed its decision and carefully crafted its ruling. Thus, we find no abuse of discretion.

Torres argues: "There was nothing particularly distinct about the appearance of the perpetrator in this case to deem it a signature to the crime. The wrapping of white cloths was not so distinctive as to render the prior event admissible to prove identity." But the relevant question for this court is not whether we agree (or disagree) with the trial court's ruling, but whether "its decision is so irrational or arbitrary that *no* reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th

10

367, 377, italics added.) Although perhaps another trial judge may have come to a different decision about the distinctiveness of the "mummy" disguise, we do not find the trial court's decision to be beyond the bounds of reason. (See *People v. Preyer* (1985) 164 Cal.App.3d 568, 573 ["'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge'"].)

In any event, we find there is no reasonable probability of a different outcome in the absence of the alleged error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) Here, the bank tellers described the armed robber as having dark skin. The robber wore a distinctive baseball hat. Within moments of the robbery, a customer who was in the bank at the time of the robbery saw the robber's hat on a street very close to the bank. Crucially, the DNA collected from the robber's hat was a match with Torres' DNA. Moreover, the prosecution introduced Torres' driver's license photo into evidence, which confirmed he was dark skinned at the time of the robbery, and he was about the same height and weight as the bank robber. Although Torres told the police he had "lost" his hat a few weeks prior to the robbery, Torres' self-serving statement in light of the totality of circumstances strains credulity and is not persuasive. Torres' brother's last minute alibi testimony is similarly dubious.

In sum, we find Torres was not prejudiced by the trial court's admission of his statement to the police that he had been previously dubbed the "Mummy Bandit."

B. *Motion for New Trial on Grounds of Ineffective Assistance of Counsel*

In February 2015, about five years after the trial, Torres filed a motion for new trial on the grounds of ineffective assistance of counsel. The trial court denied the motion under both prongs of the well-established *Strickland* test. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*).)

Torres challenges the trial court's ruling on appeal, and in a related habeas corpus petition, which we consolidated with this appeal (G059325). As the Attorney

11

General correctly pointed out during oral argument, we must review the trial court's ruling for an abuse of discretion. (See *People v. Hoyt* (2020) 8 Cal.5th 892, 957.)

A criminal defendant has a constitutional right to effective assistance of counsel. (U.S. Const., 6th Amend.; *Strickland*, *supra*, 466 U.S. at pp. 684-685.) To establish a violation of this right, a defendant must show: 1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and 2) this resulted in prejudice to the defendant. (*Id*. at pp. 687-688, 691-692.) "'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter.'" (*People v. Karis* (1988) 46 Cal.3d 612, 656.)

As to prejudice, "the question is whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland*, *supra*, 466 U.S. at p. 695.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 214-215.) "We need not and do not determine whether petitioner established the first prong, deficient performance, because we conclude, as did the trial court, that even if counsel's performance was deficient, petitioner has failed to sustain his burden on the issue of prejudice." (*In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

Here, Torres filed a 44-page motion for new trial. Torres argued 10 separate claims of ineffective assistance: 1) trial counsel's challenge to the reliability of the DNA evidence was "hopeless" and "irrational"; 2) counsel failed to clarify that the black SUV seen leaving the scene could not have been the getaway vehicle; 3) counsel failed to investigate and present corroborating evidence that the person Torres claimed had given him the baseball hat had actually died; 4) counsel failed to investigate and present alibi evidence from defendant's brother; 5) counsel failed to investigate and present evidence about the unknown person who directed the bank customer to the robber's baseball hat; 6) counsel failed to present evidence that Torres did not come into

12

the possession of a large amount of money; 7) counsel failed to cross-examine two police witnesses regarding the bank robbery suspect's initial description as an Asian male or a Black male; 8) counsel failed to exclude evidence of the knife found near Torres at the time of his arrest; 9) counsel inadvertently adduced evidence on cross-examination that the investigating officer had reviewed video from different robberies near the time of the instant robbery and this may have led jurors to believe Torres was involved in those robberies; and 10) counsel failed to adequately argue against the admission of the "Mummy Bandit" evidence. [2]

The trial court conducted a hearing on Torres' motion for new trial. At the close of the hearing, the court cited relevant constitutional principles concerning ineffective assistance of counsel claims. The court then stated:

"After considering the [respective] briefs of counsel and considering the arguments of both sides and then also having done a review of the proceedings before this court during the trial, the court rules as follows:

"First as to the various claims . . . , although there will always be collateral issues defense trial counsel might have pursued upon reflection, based upon the totality of the circumstances, the court finds . . . trial counsel's representation was neither deficient nor fell below an objective standard of reasonableness. . . . Further, based upon the same totality of the circumstances, the court finds there is no reasonable probability the result of the proceeding would have been different but for counsel's alleged unprofessional errors . . . . The court finds that trial counsel acted in a manner of a reasonably competent attorney, acting as a diligent advocate . . . ."

We need not address Torres' claims regarding his trial counsel's 10 alleged errors (the first prong of the *Strickland* test). We have independently reviewed the record and we agree with the trial court's ruling that Torres has failed to demonstrate prejudice:

---

[2] Torres' arguments in the motion for new trial are largely repeated verbatim on appeal.

a reasonable "probability sufficient to undermine confidence in the outcome." (See *People v. Williams*, *supra*, 16 Cal.4th at pp. 214-215.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.)

Here, when we review the entirety of the evidence—particularly the compelling DNA evidence—we conclude there is no "reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland*, *supra*, 466 U.S. at p. 695.) The prosecution's DNA expert testified: "'The major DNA profile from the baseball hat is estimated to be found in less than one in one trillion unrelated individuals if you take a person at random from a population.'" To put "the rarity of that profile" in perspective, the expert further testified that the population of the entire planet is about 6.5 billion people. (See additional discussion regarding prejudice as to evidentiary claim, *infra*.)

Indeed, trial counsel's strategy of attempting to cast doubt on the DNA evidence was perhaps Torres' best defense under the circumstances. In short, we find Torres has not established a reasonable probability of a more favorable outcome. Thus, we find that the trial court did not abuse its discretion by denying Torres' motion for new trial on the grounds of ineffective assistance of trial counsel.

## C. Motion to Quash

In July 2010, about five months after the jury trial, Torres' trial counsel died of brain cancer. In August 2019, about four years after the motion for new trial, and about nine years after the trial, Torres issued a subpoena for his trial counsel's medical records. Trial's counsel estate promptly filed a motion to quash the subpoena. After

14

receiving opposing briefs and after conducting a hearing on the matter, the court granted the motion without explaining its ruling (and apparently without conducting an in-camera review of the subpoenaed records). Torres challenges the ruling of the court.

In a criminal case, a defendant (or the prosecution) may issue a subpoena for records without a showing of good cause. (Pen. Code, § 1326; *Facebook, Inc. v. Superior Court* (*Touchstone*) (2020) 10 Cal.5th 329, 343-344 (*Facebook*).) However, "to *defend* such a subpoena against a motion to quash, the subpoenaing party must at that point establish good cause to acquire the subpoenaed records. In other words, as we have observed, at the motion to quash stage the defendant must show 'some cause for discovery other than "a mere desire for the benefit of all information."'" (*Id*. at p. 344.)

"We review a ruling on a motion to quash, like other discovery orders, for abuse of discretion." (*Facebook*, *supra*, 10 Cal.5th at p. 359.) Under the doctrine of implied findings and the abuse of discretion standard of review, we infer all findings supported by substantial evidence in favor of the judgment. (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 745 [implied findings inferred by appellate court if supported by substantial evidence]; *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 [under abuse of discretion standard of review, appellate court must accept trial court's implied findings of fact when supported by substantial evidence].)

In considering whether good cause has been shown to enforce a subpoena that has been challenged by a third party's motion to quash, the factors a trial court ordinarily should consider are: 1) if defendant carried his burden of showing a plausible justification for acquiring documents from a third party; 2) whether material sought is adequately described and not overly broad; 3) whether material is reasonably available to the entity from which it is sought and not readily available to defendant from other sources; 4) whether production of requested materials would violate a third party's confidentiality or privacy rights or intrude upon any protected governmental interest;

15

5) whether defendant's request is timely; 6) whether the time required to produce requested information would necessitate an unreasonable delay of defendant's trial; and 7) whether the production of records containing the requested information would place an unreasonable burden on a third party. (*Facebook*, *supra*, 10 Cal. 5th at pp. 345-347.)

Here, Torres failed to show a plausible justification for releasing his deceased trial counsel's subpoenaed medical records. Torres did not provide an affidavit to the trial court (or any other evidence) establishing a nexus between his alleged ineffective assistance claim and trial counsel's death from brain cancer about six months after the trial. Further, Torres' subpoena was exceptionally untimely (about nine years after the trial). Indeed, by the time Torres had issued the subpoena, the trial court had denied his motion for new trial about four years earlier, and the court had specifically found that trial counsel's representation of Torres was not ineffective.

Finally, it is undisputed that trial counsel's medical records were privileged and confidential. (See § 994 [patient can refuse to disclose and prevent another from disclosing confidential communication between patient and physician if privilege is claimed]; see also *California Consumer Health Care Council, Inc. v. Department of Managed Health Care* (2008) 161 Cal.App.4th 684, 694 ["physician-patient privilege survives death and the estate's representative is the holder of the privilege"].)

Thus, we conclude that the trial court did not abuse its discretion by granting the third party motion to quash trial counsel's medical records.

*D. One-Year State Prison Prior*

Effective January 1, 2020, the Legislature approved Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1). The amendment generally eliminates the one-year sentencing enhancement for a defendant who has served a prior prison term, with an exception for sexually violent offenses. (Pen. Code, § 667.5, subd. (b).) The

16

statutory change is ameliorative and applies retroactively. (See *In re Estrada* (1965) 63 Cal.2d 740, 744.)

Here, the trial court imposed a one-year prison prior for a crime that was not a sexually violent offense. Thus, we reverse Torres' one-year prison prior enhancement (the Attorney General concedes the issue). We further remand the matter for resentencing to allow the trial court to exercise its sentencing discretion.

## II

## DISPOSITION

The one-year prior prison term enhancement is reversed. (Pen. Code, § 667.5, subd (b).) In all other respects, the judgment is affirmed. The matter is remanded for resentencing consistent with this opinion.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.